# In the United States Court of Federal Claims

No. 25-1337C
(Filed Under Seal: September 8, 2025)
(Reissued for Publication: September 18, 2025)[1]

```
*************************************
                                    *
GEMINI TECH SERVICES, LLC,          *
                                    *
            Plaintiff,              *
                                    *
     v.                             *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant,              *
                                    *
And                                 *
                                    *
ACQUISITION LOGISTICS LLC,          *
                                    *
            Defendant-Intervenor.   *
                                    *
*************************************
```

## OPINION AND ORDER

This bid protest involves a challenge to the decision by the United States Army ("the Army") to override an automatic stay pursuant to the Competition in Contracting Act (CICA), 31 U.S.C. § 3553(d)(3)(C)(i). *See* ECF No. 2 at 1. Presently before the Court is Plaintiff's, Gemini Tech Services, LLC's ("Plaintiff's") Motion for a Preliminary Injunction which Plaintiff filed on August 11, 2025. *See* ECF No. 31. The Government and Defendant Intervenor filed their respective Responses to the Motion on August 20, 2025, *see* ECF No. 37-38, and Plaintiff filed a reply in support of the Motion on August 22, 2025, *see* ECF No. 39. The Motion is now fully briefed and ripe for decision. On August 28, 2025, the Court heard oral argument. The Court has considered all of the parties' arguments and addresses the issues that are pertinent to the Court's ruling in this opinion. For the reasons given below, the Court hereby **DENIES** Plaintiff's Motion.

---

[1] The Court issued this opinion under seal on September 8, 2025, and the Court gave the parties ten days to propose the redaction of competition-sensitive, proprietary, confidential, or otherwise protected information. The parties filed a document with proposed redactions. ECF No. 50. Thus, the Court issues the redacted opinion unsealed.

## I. Background

On July 18, 2025, the Army awarded a task order to Acquisition Logistics LLC ("ALL") to construct, operate, and maintain a new 5,000-capacity short-term detention facility at Fort Bliss, Texas, on Montana Avenue ("Montana Ave") for single adults awaiting immigration proceedings or removal from the United States. *See* Tab 58. Once the Army completes the construction of the Montana Ave detention facility, the Army plans to transfer detainees from an existing detention facility called the Enhanced Hardened Facility ("EHF"), which the Army states has an insufficient capacity, and transfer the detainees to the new Montana Ave facility. ECF No. 37 at 17. The base period for the award is three months long, and in that period the contractor will construct the facility, achieve initial operating capacity for 1,000 detainees, and continue to expand at a rate of 250 detainees per week. Tab 37, AR 01309.

### A. Plaintiff's GAO Protest

On July 28, 2025, Plaintiff filed its protest before the Government Accountability Office ("GAO") challenging the Agency's decision to award the contract to ALL. AR 00005-7. Plaintiff raised three allegations in its GAO protest. *See* AR 00005-7. First, Plaintiff alleged that ALL failed to comply with two material solicitation requirements: proposing a final site design and failing to propose critical utilities. AR 00005. Second, Plaintiff argued that the Army failed to evaluate the quality of offerors' past performance. AR 00006. Finally, Plaintiff contended that the Army's responsibility determination was unreasonable. AR 00006-7.

### B. The Army's Override Decision

In this case, a stay of contract performance in this procurement was triggered pursuant to 31 U.S.C. § 3553(d)(3)(A) when Plaintiff filed its currently-pending protest before the GAO on July 28, 2025. *See* ECF No. 2 at 2. At that point, CICA required the contracting officer to "immediately direct the contractor to cease performance under the contract[.]" 31 U.S.C. § 3553(d)(3)(A)(ii). But instead of doing that, the Army determined it would override the stay and gave an "oral" direction on July 28, 2025, to continue performance under ALL's task order.

Under CICA and the AFARS, the Army could override the stay only after executing a written determination and notifying GAO, but the Army proceeded with performance without doing either of those things. 31 U.S.C. § 3553(d)(3)(C); AFARS 5133.104(c)(2). The Army eventually notified GAO of its decision three days later on July 31, executed a determination and findings ("D&F") on August 1, and filed that D&F with GAO the following week on August 4, 2025. Although the Army corrected its error, the Court notes that by proceeding with the contract performance without first notifying GAO and executing a written determination, the Army violated the statute by failing to comply with the CICA stay which was in place.

Plaintiff correctly points out that if the stay override is not removed, the contract here will be completed before the GAO reaches its decision on November 5, 2025. Lilly Decl. ¶ 3. To this point, the Court highlights that though the GAO has a statutory requirement to resolve protests within 100 days, 31 U.S.C. § 3554(a)(1), the Court wonders why the GAO did not expedite its decision-making. *See* 4 C.F.R. §21.10(a) ("Upon a request filed by a party or on its

own initiative, GAO may decide a protest using an express option"). In the case of contracts with a short time frame, the competitive system is open to manipulation.

### C. The Army's Determination and Findings Memorandum

The 10-page D&F, dated August 1, 2025, documents the Army's rationale. Tab 19. It describes the nature, origin, and urgency of the requirement, as well as the procedures used to solicit the requirement. AR 00324-328. The D&F went on to document the GAO protest filed by Plaintiff, noting "[a]fter consultation with legal, it is the Army's position that the protestor's protest lacks merit, and that the Army has strong substantive defenses which it will assert and upon which it will prevail." AR 00327. The substance of the D&F determination is discussed in further detail below.

## II. Jurisdiction and Standard of Review

### A. Jurisdiction

The Court of Federal Claims possesses jurisdiction to entertain bid protests pursuant to the Tucker Act, 28 U.S.C. §1491(b)(1). 28 U.S.C. § 1491(b)(4) requires that the Court "review the Army's decision pursuant to the standards set forth in section 706 of title 5" of the Administrative Procedure Act (APA). *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). Thus, in a bid protest, applying the APA standard of review, the Court must determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under this standard a court "must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors." *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010) (internal quotation marks and citation omitted). The APA does not permit the court to undertake a *de novo* review of the agency's procurement decision. *Axiom Resource Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009).

To prevail in a bid protest, a plaintiff must demonstrate: 1) that the procurement decision "lacked a rational basis"; or 2) "a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1332-33 (citations omitted). "When a challenge is brought on the first ground, the test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the [protestor] . . . bears a heavy burden of showing that the award decision had no rational basis.'" *Banknote*, 365 F.3d at 1351 (quoting *Impresa*, 238 F.3d at 1332-33); *accord Axiom*, 564 F.3d at 1381. The rational basis standard requires the agency's decision to have "considered the relevant factors" and to be "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

When a protestor challenges a decision as arbitrary and capricious, the Court is "highly deferential" to the agency's action. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). "The court must especially defer to the agency's technical evaluations, past performance ratings, and other 'minutiae of the procurement process . . . which

3

involve discretionary determinations of procurement officials.'" *J.C.N. Const., Inc. v. United States*, 107 Fed. Cl. 503, 510 (2012) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). When the Court finds a reasonable basis for an agency's action, it "stay[s] its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989); *see also Bowman Transp., Inc., v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285-86 (1974).

### B. Standard of Review for Preliminary Injunctive Relief

The Federal Circuit has held:

> To obtain the extraordinary relief of an injunction prior to trial, the movant carries the burden to establish a right thereto in light of the following factors: 1) that the movant is likely to succeed on the merits at trial; 2) that it will suffer irreparable harm if preliminary relief is not granted; 3) that the balance of the hardships tips in the movant's favor; and 4) that a preliminary injunction will not be contrary to the public interest.

*FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) (citations omitted). When considering these factors, "the weakness of the showing regarding one factor may be overborne by the strength of the others," while "the absence of an adequate showing with regard to any one factor may be sufficient . . . to justify the denial" of the preliminary injunction. *Id.* (citations omitted). The Federal Circuit also notes, however that "[a]bsent a showing that a movant is likely to succeed on the merits," it is unclear "whether the movant can ever be entitled to a preliminary injunction unless some extraordinary injury or strong public interest is also shown." *Id.*

### C. Standard of Review for Merits of an Override Decision

This Court possesses jurisdiction over challenges to CICA stay override decisions pursuant to the Tucker Act, 28 U.S.C. § 1491(b). *Dyncorp Int'l LLC v. United States*, 113 Fed. Cl. 298, 302 (2013) (citing *RAMCOR Serv. Grp., Inc. v. United States*, 185 F.3d 1286, 1290 (Fed. Cir. 1999)). The Court reviews an agency's decision to override a CICA stay pursuant to the standards established by the Administrative Procedure Act (APA), 5 U.S.C. § 706. *Dyncorp Int'l*, 113 Fed. Cl. at 302. That is, a protestor challenging an override decision must establish that the decision was "arbitrary, capricious, or otherwise not in accordance with law." *Id*. (citations omitted).

"The [C]ourt's role is to determine if the override was based on a consideration of the relevant factors and whether there has been a clear error in judgment by the agency." *Automation Techs. v. United States*, 72 Fed. Cl. 723, 727 (2006) (citation and quotation marks omitted). The Court should ask whether there has been "a clear error of judgment," without substituting its own judgment for that of the agency. *E.g., Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1309 (Fed. Cir. 2004); *Chapman Law Firm v. United States*, 62 Fed. Cl. 464, 466 (2004) (reviewing whether the agency had "a rational basis" for its override determination); *see also*

*Dell Fed. Sys. L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (confirming that the rational basis test applicable to bid protest cases asks "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.").

In order to successfully challenge an agency's decision to override a CICA stay, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 709 (2006) (citing 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A)). Thus, the first issue before the Court here is whether the Army's decision - that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the GAO's decision - was "arbitrary, capricious, or otherwise not in accordance with law." *Dyncorp Int'l*, 113 Fed. Cl. at 302.

The Supreme Court states:

> Normally, an agency [decision] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In *Reilly's Wholesale*, 73 Fed. Cl. at 711, this Court has identified four factors for consideration in determining whether an agency properly decided to override a CICA stay:

> (1) whether significant adverse consequences would occur absent the override; (2) whether reasonable alternatives to the override were available; (3) how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compared to the benefits associated with the approach being considered for addressing the agency's needs; and (4) the effects of the override on the competition and integrity of the procurement system.

### D. Competition in Contracting Act

The CICA states, in relevant part, as follows:

> (A) If the Federal agency awarding the contract receives notice of a protest in accordance with this section during the period described in paragraph (4)—
>
> > (i) the contracting officer may not authorize performance of the contract to begin while the protest is pending; or
> > (ii) if authorization for contract performance to proceed was not withheld . . . before receipt of the notice, the contracting officer shall immediately direct the contractor to cease performance under the contract and to suspend

5

> any related activities that may result in additional obligations being incurred by the United States under that contract.
>
> (B) Performance and related activities suspended pursuant to subparagraph (A)(ii) by reason of a protest may not be resumed while the protest is pending.
>
> (C) The head of the procuring activity may authorize the performance of the contract (notwithstanding a protest of which the Federal agency has notice under this section)—
>
>> (i) upon a written finding that—
>>> (I) performance of the contract is in the best interests of the United States; or
>>> (II) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest; and
>>
>> (ii) after the Comptroller General is notified of that finding.

31 U.S.C. § 3553(d)(3).

The CICA itself does not define "urgent and compelling circumstances" that would warrant the override of a CICA stay. *See* 31 U.S.C. §3551 (not including "urgent and compelling circumstances" in the list of CICA's defined terms). As Congress prepared to reconcile various bills that would become CICA, however, the terms "urgent" and "compelling" were used to describe situations permitting sole-source procurements, and that use of "urgent" and "compelling" provides at least some sense of the meaning of these terms. S. Rep. No. 98-50, at 21 (1983) (citations omitted) as reprinted in 1984 U.S.C.C.A.N. 2174, 2194. From the Congressional use of the terms, it would seem that a threat of immediate harm to health, welfare or safety would appear to qualify as "urgent and compelling circumstances" for the purposes of CICA stay overrides, just as a threat of immediate harm to health, welfare or safety would create a situation where the "unusual and compelling urgency" of agency needs permits a sole-source procurement. *See id.*

### E. The Army Federal Acquisition Regulation Supplement

The AFARS, adopting the *Reilly's Wholesale* factors, states what the Contracting Officer must do:

> (1)(A) The Contracting officer must prepare a determination and findings (D&F) for HCA approval when it is necessary to request authorization to award a contract notwithstanding a protest. This authority is non-delegable. The D&F must clearly **address** –
> (*1*) Whether significant adverse consequences will necessarily occur if the stay is not overridden;
> (*2*) Whether reasonable alternatives to the override exist that would adequately address the circumstances presented;

(*3*) How the potential costs of proceeding with the override, including the costs associated with the potential that GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs; and
(*4*) The impact of the override on competition and the integrity of the procurement system.

AFARS 5133.104(b)(1)(A); *Reilly's Wholesale*, 73 Fed. Cl. at 711.

    **I.    DISCUSSION**

    The focal point of this protest is the Army's D&F, which documents the Army's consideration of the basis for and effect of the proposed override of the CICA stay. The Army's D&F specifies that the Army determined that "urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the decision of the GAO's decision in the protest."[2] AR 333; 31 U.S.C. § 3553(c)(2). The Army explained that this contract aligned with priorities of Executive Order 14159, which directs for the efficient and expedited removal of aliens from the United States. AR 00328.

    The Army identified that the United States Immigration and Customs Enforcement's ("ICE's") ability to execute the executive order was impeded by a detention capacity shortfall. *Id.* Specifically, ICE was managing 57,600 detainees with only 41,500 beds, "creating significant operational strain." AR 00324. The Army found that Montana Ave detention facility would directly address this compelling need. *Id.*, AR 00328. Further, the Army explained that the existing detention capacity crisis created overcrowding, "demand[ing] immediate action to ensure humane treatment, appropriate care, and legal compliance" for all detainees. *Id.* The Army thus stated that any delay would hinder ICE's national security and public safety efforts while also harming detainees. *Id.*

    The Court, relying on the test articulated by the court in *Reilly's Wholesale*, which is mirrored in AFARS 5133.104(b)(1)(A), will evaluate whether the Army's decision to override the stay is arbitrary or capricious by considering:

> (1) whether significant adverse consequences would occur absent the override; (2) whether reasonable alternatives to the override were available; (3) how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compared to the benefits associated with the approach being considered for addressing the agency's needs; and (4) the effects of the override on the competition and integrity of the procurement system.

*Reilly's Wholesale*, 73 Fed. Cl. at 711; AFARS 5133.104(b)(1)(A).

---

[2] Although the Army references the "best interests" factor in the D&F, the overarching reason given here is that "urgent and compelling" reasons warrant an override of the automatic CICA stay. AR 333.

Plaintiff makes four arguments in support of its Motion for a Preliminary Injunction: (1) the D&F fails to establish that significant adverse consequences will necessarily occur if the stay is not overridden; (2) the D&F ignores reasonable alternatives that would adequately address the circumstances presented; (3) the D&F fails to establish that the cost of implementing the stay would exceed the cost of an override; (4) the D&F fails to establish that an override will not damage competition and the integrity of the procurement process. ECF No. 6 at 13-24.

The Government and Intervenor assert that the CICA stay override was rational and that each of Plaintiff's arguments fail in substance or because Plaintiff asks this Court to second guess the agency's rational. The Court considers each of Plaintiff's arguments below.

### 1. The Army Rationally Considered Whether Adverse Consequences Would Necessarily Occur if the Stay were not Overridden

First, Plaintiff argues that the Army's D&F did not identify adverse consequences that were specific enough to justify overriding the stay. Instead, Plaintiff asserts that the adverse consequences identified by the Army's D&F were speculative and do not meet the standard of "urgent and compelling." ECF No. 6 at 20 (quoting *AT&T*, 133 Fed. Cl. at 556).[3] The Government and Intervenor contend, however, that the Army's D&F details at length the significant consequences that will necessarily occur absent an override, and the Army rationally concluded that "urgent and compelling" circumstances exist which justify overriding the stay. The Court agrees.

The Army's D&F states the following:

**(1) Whether significant adverse consequences will necessarily occur if the stay is not overridden:**
Significant adverse consequences that may occur without this override are laid out in detail in the attached mission impact statement, which I hereby incorporate into this document. See Tab 7 (Mission Impact Statement). Specifically, a continued stay will directly exacerbate the existing detention capacity crisis, hindering ICE's ability to effectively manage the influx of detainee apprehensions.

---

[3] Plaintiff argues that the United States is partially responsible for the detention capacity crisis when ICE previously awarded and terminated a contract for the Montana Ave detention facility while the Army also reduced capacity at the EHF. ECF No. 6 at 15. This argument, however, fails to acknowledge the developing facts or show error in the Army's reasoned consideration. If the Army found that it needed to cancel its prior solicitation because it found a flaw, that decision does not mean that the Army's needs here are not still urgent. As the Army described, the detention capacity crisis is "immediate and escalating," building throughout the year due to exigent circumstances to address the President's declared national emergency. Tab 21, AR 353.

> This will result in increased operational risks, potential legal challenges related to overcrowding, and a heightened strain on resources. The delay will also disrupt planned operational deployments and enforcement activities reliant on adequate detention capacity, directly impacting ICE's core mission as outlined in the SOO. The current overcapacity situation is unsustainable and demands immediate action to ensure humane treatment, appropriate care, and legal compliance.

AR 00328. In making its argument, Plaintiff relies on the Court's decision in *AT&T Corp. v. United States*, 133 Fed. Cl. 550 (2017), to argue that the agency is required to identify not "potential risks," but consequences that will "necessarily occur." ECF No. 6 at 13 (citing *AT&T*, 133 Fed. Cl. at 556). *AT&T*, however, is only persuasive authority, and the facts in that case are distinct. In *AT&T*, the Court found that the agency's conclusions regarding the schedule delay, cost, quality, and mission impact on the 2020 Census were speculative, and did not involve threats to health, welfare, or safety. *Id.* The Court found that the agency overstated the certainty of its own schedule, which made allowances for, inter alia, weather and job market conditions. *Id.*

After considering the Army's D&F, it is clear that the concerns listed here are specific and concrete and not speculative as Plaintiff asserts. The D&F and the supporting Mission Impact Statement clearly set forth the significant adverse impact of staying performance. *See generally* AR, Tabs 19, 21. First, the Mission Impact Statement notes that there are several Presidential directives addressing the criticality of the services being acquired under this contract:

> - Proclamation 10886 directs the Secretary of Defense to support the Department of Homeland Security "in obtaining complete operational control of the southern border of the United States . . . [and] to take all appropriate action to facilitate the operational needs of the Secretary of Homeland Security along the southern border."
> - EO 14159 "directs the Secretary of Homeland Security to ensure efficient and effective removal of aliens from the United States as a means to provide for the safety, security, and financial and economic well-being of Americans."
> - EO 14165 provides that it is the policy of the United States to detain, "to the maximum extent authorized by law, aliens apprehended on suspicion of violating Federal or State law, until such time they are removed from the United States and ordered the Secretary of Homeland Security to take all appropriate action to do so."

AR 00350. Turning to the specific adverse consequences, the D&F notes that ICE is presently "managing approximately 57,600 detainees with a capacity of only 41,500 beds funded in FY25." AR 00324. While the overage is being maintained by state-funded facilities, "ICE has many outstanding final remove orders and convicted criminals that cannot be detained due to capacity constraints." *Id.*, *see also* AR00352 ("Without this override there will be a detrimental impact on National Security due to the decreased capacity to support ongoing illegal alien detention and removal operations."). According to the Mission Impact Statement, suspension of performance "will have a detrimental impact on ICE's ability to manage the current detention

9

surge, leading to increased costs associated with identifying and securing alternative, less-than-ideal detention solutions, and potentially compromise national security and public safety." AR 00353.

The facts here also differ from *AT&T* in that the circumstances involve threats to health, welfare or safety and were not speculative consequences, and thus qualify as "urgent and compelling," circumstances which warrant overriding the stay. Here, the Army and ICE were charged with "an urgent and compelling requirement to enforce U.S. immigration laws and ensure public safety as outlined in the President's Executive Orders 14159 (Protecting the American People Against Invasion) and 14165 (Securing Our Borders)." A delay in performance would "critically jeopardize ICE's ability to manage the escalating detention surge." *Id.*

The Army explained that delaying performance of the contract by up to 100 days not only allows the threat to national security to continue unmitigated during that delay, and the resulting delay to completion of the facility, but also jeopardizes the humanitarian concerns of detainees subject to overcrowding. Tab 19, AR00328; Tab 20, AR00346-47; Tab 21, AR00353.

The Army found that the performance was necessary because other ICE facilities were overcrowded, more detention space was necessary to address the President's national emergency findings, and overcrowding directly impacted public safety. In sum, the Army appropriately measured the "urgency of the procurement situation," and rationally determined that an "immediate threat of harm to health, welfare or safety exists." *See PMTech*, 95 Fed. Cl. at 346.

Finally, for the Court to require an agency to demonstrate with absolute certainty that future consequences will occur dramatically "overstates what is required by the arbitrary and capricious standard." *Dyncorp Int'l*, 113 Fed Cl. at 302 n.4; *see also, e.g.*, *Safeguard Base Operations, LLC v United States*, 140 Fed. Cl. 670, 701-02 (2018) (finding the first *Reilly's Wholesale* factor met based on identified consequences that were less than certain); *Beechcraft Defense Co., LLC v. United States*, 111 Fed. Cl. 24, 31 (2013) (same); *EOD Technology, Inc. v. United States*, 82 Fed. Cl. 12, 20 (2008) (same). Here, it is clear to the Court that the Army considered adverse consequences that would necessarily occur absent a stay override and rationally determined that a stay override was necessary.

### 2. The Army Rationally Considered Whether Reasonable Alternatives Exist that Would Adequately Address the Circumstances Presented

Plaintiff argues that the Army failed to consider all of the available alternatives to an override of the automatic stay. According to Plaintiff, the Army could have used the EHF facility to house detainees under the previous contract, could have used the EHF facility by creating a bridge contract, or could have considered the use of other facilities such as state facilities.

Concerning this factor, the D&F states the following:

**(2) Whether reasonable alternatives to the override exist that would adequately address the circumstances presented:**

> All alternatives to the CICA override have been considered, but, as provided below, none are determined to be reasonable. Because there is no existing bridge contract, relying on temporary solutions or ad-hoc arrangements to secure additional bed space will be prohibitively expensive and logistically complex. Utilizing the existing Enhanced Hardened Facility (EHF) is not a viable option. The EHF was originally designed and constructed for a capacity of 2500 detainees. On May 24, 2025, the Secretary of Defense elected to decrease the scope of that facility to a maximum capacity of 1000 detainees and it is operating at or near this maximum already. Subsequent to that de-scoping, the number of detainees that ICE is administering has increased drastically. Increasing the capacity of the EHF beyond 1000 detainees will require significant structural modifications and expansion, constituting a substantial change to the scope of work. Such a change will necessitate a new competitive procurement to ensure fairness and compliance with procurement regulations. Attempting to initiate a new procurement will result in an unacceptable delay of at least six months, further exacerbating the operational challenges and the existing humanitarian concerns related to overcrowding, directly contradicting the urgent need outlined in the SOO. Accordingly, this contract is not a reasonable alternative to an override.

AR 00329.

The Army's D&F documents its consideration of alternatives to overriding the stay before rationally concluding that none would adequately address the urgent circumstances. Tab 19, AR 00327, 329. There is no incumbent contractor to which the Army could have considered awarding a bridge contract for the Montana Ave detention facility because it is a new detention facility to address an emerging, critical national security concern. *Id.*; Tab 20, AR 00347. Any other alternative would, thus, necessarily involve the award of a new contract, task order, or other contractual mechanism.

Although Plaintiff asserts that a bridge contract utilizing the existing EHF would be a reasonable alternative, the Army's D&F explains that this option is not a reasonable alternative. Tab 19, AR 00329; Tab 20, AR 00347. As the Army explained, the EHF was operating near its maximum capacity of 1,000 detainees at the time of the override, unable to take in the additional 5,000 more that the Montana Ave detention facility would scale up to during the GAO protest. Tab 19, AR 00329; Tab 20, AR 00347. Further, the Army stated that the EHF could not be expanded beyond 1,000 detainees without major modification and a new competitive procurement, requiring significant delays. Tab 19, AR 00329; Tab 20, AR 00347. Plaintiff disagrees, arguing that it has immediate capacity to increase capacity without modification or procurement. ECF No. 6 at 19. This, however, is mere disagreement with the Army's reasoning, not sufficient to show that the Army lacked a rational basis. *See Automation*, 72 Fed. Cl. at 727. Further, the EHF, which is a different type of facility than the soft-sided detention facility being provided through this procurement, would at best be a part of the solution, rather than an alternative.

During the course of the proceedings at this Court, the Army closed operations at the EHF on August 26, 2025, as the Army did not exercise option period 5 to extend the contract. ECF No. 43-1 at 1-2.[4] The Court notes that this decision blind-sided the Court and Plaintiff. There was no hint in any of the submissions to the Court that the contract would be allowed to expire. Although the EHF is not the subject of this procurement, the contract was clearly relevant to the proceedings here, and the Army could have extended that contract by 30 days until the Court issued its determination. Nevertheless, because the EHF is now closed, it is further clear that this option is not a reasonable alternative as it would require the Army to create a new contract to continue operations at EHF in addition to all the modifications that the Army noted would be necessary.

During oral argument, the Government asserted that another reason that the Army decided that the EHF was not a reasonable alternative was that it did not meet the standards of the new Montana Ave facility. The Government argued that the new facility is more humane, as it is intended for longer periods of stay. Also, the Government states that the new facility complies with federal standards, including "guarantee[ing] humane treatment, protection from harm, appropriate medical and mental health care, and the rights and protections to which detainees are entitled." Tab 19, AR 00328; *see also* Tabs 38-48 (applicable standards).

Plaintiff asserted during oral argument that the D&F did not support its assertion that the EHF was not a reasonable alternative. The Court, however, notes that the Army did provide specific reasons for why the EHF was not a reasonable alternative. First, the Army states that the EHF is not a viable option because the facility does not meet the current needs of the Army and would require "significant structural modifications," to the existing facility. In addition, the Army states that this delay would "further exacerbat[e] the operational challenges and the existing humanitarian concerns related to overcrowding, directly contradicting the urgent need outlined in the SOO." Although Plaintiff correctly asserts that the D&F does not state that the EHF did not provide humane and safe conditions as required by the new standards for this solicitation, the D&F states that the new standards ensure humane treatment, "the current overcapacity situation is unsustainable and demands immediate action to ensure humane treatment, appropriate care, and legal compliance." AR 00328. Thus, in the D&F, the Army found that the EHF as it currently stands would not meet the standards necessary for this contract and thus determined that it would not be a reasonable alternative.

It is important to note that nothing in the record establishes otherwise that the EHF would actually meet the standards required by this new solicitation and thus be a reasonable alternative to the Montana Ave facility. Further, Plaintiff does not provide any support making such an assertion. Thus, the Court does not have reason to doubt the reasoning of the Army. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) ("the test for reviewing courts is to determine whether the contracting agency

---

[4] When the Court became aware that the EHF would close on August 26, 2025, the Court issued an order, ECF No. 41, staying the closure of the EHF. The Court then held a hearing concerning the closing of operations at EHF on August 27, 2025, and for the reasons stated on the Record, the Court lifted the temporary stay. ECF No. 45.

provided a coherent and reasonable explanation of its exercise of discretion and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.")

Further, in response to the Court's request for more information concerning the EHF, the Army submitted a declaration from Master Sergeant Kailey A. Good-Hallahan, the contracting officer who wrote the D&F here. The declaration states:

> One of the Department of Defense's concerns is that the EHF is only required to comply with the Customs and Border Protection National Standards on Transport, Escort, Detention, and Search (CBP-TEDS), which is expressly incorporated into the Performance Work Statement, paragraph 6.17. These standards are lower than the National Detention Standards that the Fort Bliss Montana Ave detention facility is required to meet. Per CBP-TEDS standards, detainees should not be held for longer than 72 hours. These standards focus on basic care during initial apprehension, lacking the robust requirements for medical care, legal access, recreation, and other protections critical for longer-term detention. In contrast, the Fort Bliss Montana Avenue facility is built to comply with ICE's National Detention Standards 2025, a comprehensive framework designed to ensure the health, safety, and rights of individuals in extended ICE custody. Relying on TEDS for operations beyond their intended short-term scope raises serious concerns about detainee welfare and the adequacy of the standards being applied. To provide one tangible example, the EHF does not have beds for illegal aliens housed there. Instead, they sleep on floor mats. Alternatively, at the Montana Avenue detention facility, which is designed for longer holds, each illegal alien will have a bed.

ECF No. 43-1 at 1-2. This document, although not part of the D&F shows in further detail the information that was before the Army at the time it made its decision. The new standards for this solicitation which the Army states would ensure safety and humane conditions were referred to in the D&F, AR 00324, but this declaration provides more insight into the differing standards of the new solicitation and the EHF itself. Although this additional evidence does not affect the Court's decision, it does provide further background for what was before the Army when it made its decision. This declaration shows that the standards at the EHF facility are lower standards than required at the new Montana Ave facility, thus showing more insight into the Army's decision. This Court has held that the record includes any evidence that the agency relied upon or considered in reaching its procurement decision, thus this evidence is relevant to the case at hand. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (the record includes everything "before the decision maker."); *Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 168-69 (2011) (In other words, the record must include all materials that were "directly or indirectly considered by the agency decisionmakers").

Thus, for the reasons given above, the Court holds that the Army's decision that the EHF was not a reasonable alternative is a rational decision. The Federal Circuit has held that, "'[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc.*, 870 F.2d at 648 (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

Finally, Plaintiff contends that the Army should have considered using state facilities. ECF No. 6 at 20. The Army clearly stated that "[a]ll alternatives to the CICA override have been considered, but . . . none are determined to be reasonable." Tab 19, AR 00329; *see Analysis Group*, 2009 WL 3747171, at *5 ("CICA's command is for 'reasonable alternatives' to exist, not just 'alternatives.'"); *Reilly's Wholesale*, 73 Fed. Cl. at 711 (holding that an agency must consider "whether reasonable alternatives to the override exist that would adequately address the circumstances presented") (emphasis added).

Specifically, regarding the adequacy of state facilities, in its response brief the Government attached the declaration of Colonel Randy J. Garcia, Senior Contracting Officer for the Mission and Installation Contracting Command Field Directorate Office-Fort Sam Houston, which explains "[o]nly a Federal facility can guarantee compliance with the various standards regulating the conditions in which illegal aliens will be held." Col. Garcia Decl. ¶ 5. Thus, the Army knew that this alternative was not reasonable because in a state facility the United States "cannot ensure illegal aliens are detained in conditions that meet Federal standards." *Id.* Although this evidence is not explained in the D&F itself, the declaration does provide information that the Army would have been apprised of when it made its decision. *See Joint Venture*, 100 Fed. Cl. at 168-69 (In other words, the record must include all materials that were "directly or indirectly considered by the agency decisionmakers"). Thus, for the reasons given above, the Army's D&F rationally concludes that there were no reasonable alternatives to the Montana Ave detention facility to meet the needs of the present detainee crisis, and, therefore, meets the APA standard.

### 3. The Army Rationally Considered How the Potential Costs of the Stay Override Compare to the Benefits Associated with the Approach Being Considered for Addressing the Agency's Needs is Not Contrary to the Evidence

Plaintiff asserts that where an agency provides no meaningful "explanation or breakdown" for the dollar values allegedly justifying a CICA override, that "indicat[es] to the Court that the Agency did not conduct a significant analysis of the cost and benefits of proceeding with the override." ECF No. 6 at 21 (quoting *AT&T*, 133 Fed. Cl. at 557 (rejecting override where agency provided "no reasoning to demonstrate that the benefits of the override outweigh the costs of proceeding with the CICA stay in place")). The Army's D&F documents its consideration of the potential costs of proceeding with the override, as well as its comparison of those costs to the benefits of doing so. Specifically, the D&F states:

> **(3) How the potential cost of proceeding with the override compares with the costs associated with the potential that the GAO might sustain the protest:**
> In the event the override is authorized, and the protestor prevails in its protest, the Army will have expended the costs of performance up to 100 days. However, the cost of not overriding the stay and continuing to operate with a significant detention capacity shortfall, coupled with the operational,

> national security, and legal risks detailed in the Mission Impact Statement, are estimated to be significantly higher -in excess of $500M. This figure includes potential legal liabilities, increased transportation costs for transferring detainees, and the cost of securing emergency, short-term detention solutions. ALL projects that a stop-work order implemented at 100 days, approximately on 5 November 2025, would result in approximately $403 million in liabilities. This estimate includes $▮ for base period mobilization, $▮ for service Contract Line Item Numbers (CLINs), $▮ for option period 1 mobilization, $▮ for 35 days of service within option period 1, and $▮ for demobilization.
>
> ALL has provided the following cost projections in the event of contract termination on or about 1 August 2025. Termination would result in approximately $▮ in liabilities. All's submitted mobilization quote is $▮. As of 28 July 2025, ALL estimates mobilization is 57% complete, factoring in existing supplies and outstanding orders. Based on this progress, the estimated cost owed to ALL for completed mobilization efforts is approximately $▮, and $▮ for demobilization. These costs must be considered in light of a critical and escalating situation. The Department of Homeland Security (OHS) reports 1.5 million active final removal orders, yet only 41,500 federally funded bed spaces are currently available, necessitating reliance on state-funded facilities to address the shortfall. Current detention facilities are critically overcrowded, housing 57,600 individuals. This overcrowding creates unsafe conditions for both U.S. Immigration and Customs Enforcement (ICE) agents and those in custody, increasing the risk of altercations, health crises, and potential security breaches. Failure to address this capacity gap poses significant operational, security, and humanitarian risks, demanding immediate attention and resolution. Therefore, the benefits of overriding the stay and proceeding with performance greatly outweigh the potential costs of not doing so.

AR 00329-330.

The Army found that "the cost of not overriding the stay and continuing to operate with a significant detention capacity shortfall, coupled with the operational, national security, and legal risks detailed in the Mission Impact Statement, are estimated to be significantly higher [than the costs of performance up to 100 days]—in excess of $500M." AR 00329. According to the Army, this figure includes "potential legal liabilities, increased transportation costs for transferring detainees, and the cost of securing emergency, short-term detention solutions."[5] *Id.*

---

[5] The Mission Impact Statement expounds on this, providing:

If the stay is overridden, however, and Plaintiff's GAO protest proceeds to a decision after 100 days, ALL has estimated that it will have incurred over $403 million in liabilities. *See* AR 00329. Plaintiff criticizes these cost estimates as insufficient, but that alone is not adequate to establish that the Army acted irrationally.

Further, the Court has held that a complete quantification of costs is not necessary when there are "significant risks that would result from not overriding the stay." *See Superior Helicopter LLC v. United States*, 78 Fed. Cl. 181, 193 (2007) (sanctioning agency's conclusion that the "inability to guarantee helicopter availability and therefore to prevent the loss of life and property . . . outweigh the ramifications of any sustained bid protest"); *see also Safeguard Base Operations, LLC v. United States*, 140 Fed. Cl. 670, 705 (2018) (finding agency override reasonable when "the Agency considered the possibility of the GAO sustaining Safeguard's second post-award bid protest and[,] . . . was aware that it would incur any costs associated if such a result at the GAO should occur, but concluded the total risks to the Agency were worth overriding the stay"). Indeed, the D&F here explains that the costs must be considered in conjunction with the critical overcrowding situation "increasing the risk of altercations, health crises, and potential security breaches." AR 00330.

It appears that Plaintiff's contentions focus on the monetary explanation of the cost analysis, arguing that the Army's numbers are unexplained and thus fail to demonstrate that the cost of implementing the stay would exceed the supposed costs of an override. Plaintiff cannot show that the Army's estimates are flawed, however, as these humanitarian and security risks are also a legitimate part of the calculation when considering the costs of a stay of performance. *See Fisher Sand & Gravel Co.*, 143 Fed. Cl. at 253 (finding it appropriate for the Army to consider "the nonmonetary costs associated with a stay of performance (humanitarian and border security concerns) and found them too great to ignore. . . . The D & F's statement that the costs associated with these problems are not strictly measurable in extra taxpayer dollars should the agency be forced to recompete is rational."). The Army's D&F makes clear that the urgent and compelling national security concerns far outweigh any short-term monetary costs the Army might have to bear if it later needs to change course in light of the GAO's resolution of the protest. *See STG*, 147 Fed. Cl. at 809 ("The court defers to the Army's conclusion about the acceptable risk to the Army if [protestor]'s protest is successful."); Tab 19, AR 00329. Accordingly, the Army rationally considered the potential costs of proceeding with the override against the benefit of doing so, providing a coherent and reasonable explanation.

---

> On 1 August services begin to support the operations of illegal aliens (IA). These services include billeting, armed guards, unarmed guards, medical services, meals, transportation and detention process support services. If services are shut off, the vendor cannot continue services and any existing IA would have to be transferred to another facility, incurring additional costs. This would further prevent it from reaching its essential initial operating capacity of 1000 detainees by 17 August 2025.

AR 00352.

#### 4. The Army Rationally Considered the Impact of the Override on Competition and the Integrity of the Procurement System

Plaintiff next argues that the Army does not present enough evidence to show that the impact of the override on competition and the integrity of the procurement system, and therefore the Army's D&F is arbitrary and capricious. Although Plaintiff argues that the Army does not offer enough explanation here, Plaintiff does not show that the Army's rational is arbitrary or capricious. Concerning this issue, the D&F states:

> **(4) The impact of the override on competition and integrity of the procurement system:**
> The source selection process for the WEXMAC 2.0 contract has been concluded, and an awardee has been identified. Approving the requested override of the stay will not compromise competition for future requirements, as demonstrated by the robust competition throughout Phases 1 and 2 of the WEXMAC 2.0 solicitation. All vendors approved for the base WEXMAC contract have undergone thorough pre-vetting and have been determined to be fully capable and responsible, meeting the established price ceiling. This determination is predicated on the urgent operational needs of U.S. Immigration and Customs Enforcement and the critical national security implications stemming from the current detention capacity crisis. The Army remains steadfastly committed to a fair and transparent procurement process and will provide a comprehensive response to the Government Accountability Office addressing the concerns raised in the protest. This override is a narrowly tailored decision, driven by compelling operational imperatives and does not reflect a disregard for fair competition. Given the substantial progress already achieved by the current awardee and the nature of the work completed to date, transitioning performance to a new vendor would present significant logistical and operational challenges. Replicating the established infrastructure, personnel, and ongoing operational tempo would introduce unacceptable risk to mission continuity and potentially result in substantial delays and increased costs. A seamless transition is not reasonably achievable within the required timeframe, and any attempt to do so would jeopardize the critical detention capacity needed to address the current national security imperative. Should GAO sustain Gemini's protest, the Army will consider GAO's decision and any recommended corrective action and determine a way forward at that time.

AR 00330-331.

The Army's D&F explains that a full competitive award process has already been completed and that the Army comprehensively considered Plaintiff's protest allegations at the time it was considering whether to override the CICA stay. By seriously considering the protest allegations and any available reasonable alternatives, the Army reasonably "considered the impact that overriding the CICA stay would have on the integrity of the procurement system." *STG LLC v. United States*, 147 Fed. Cl. 790, 810 (2020) (finding Army acted reasonably when "[i]n addition to considering the merits of the protestor's arguments to determine whether the Army believed the arguments had merit before proceeding with the override, as noted above, the

17

contracting officer also reached out to the incumbent contractor GDIT to gauge if a bridge contract was feasible").

While the Army conducted a two-phased competitive procurement and considered Plaintiff's protest allegations before overriding the CICA stay, the Army's rationality is further bolstered here where the procurement supports combatting what the President has deemed an issue of national security. Pursuant to Title 28 United States Code, Section 1491(b)(3), this Court must give due consideration to the weighty national security concerns implicated in this project. *See* 28 USC 1491(b)(3) ("[i]n exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."). Thus, the Court holds that the Army's explanation of the impact of the override on competition and the integrity of the procurement system was not arbitrary and capricious.

Because Plaintiff cannot demonstrate that the Army acted in a manner that was arbitrary and capricious or not in accordance with law, Plaintiff has not established a likelihood of success on the merits. Because Plaintiff has not demonstrated a likelihood of success on the merits, which is a necessary showing to establish entitlement to a preliminary injunction, the Court **DENIES** Plaintiff's Motion for a Preliminary Injunction. *Somerset Pharm., Inc. v. Dudas*, 500 F.3d 1344, 1346 (Fed. Cir. 2007) (citing *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1324-25 (Fed. Cir. 2004) (explaining that to establish entitlement to a preliminary injunction, a plaintiff must prevail on the first factor—the likelihood of success on the merits)).

Although the Court was disappointed with the Army's actions in this procurement, because there is a reasonable basis for the Army's decision, the Court must "stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc.*, 870 F.2d at 648.

## II. CONCLUSION

For the reasons given above, the Court **DENIES** Plaintiff's Motion for a Preliminary Injunction. In light of this Opinion, the Complaint is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge
